MARY BREEMERSCH v. ELLA F. LINN AND WILLIAM F. LINN.

*Contract—Fraud—Rescission.*

Courts cannot make contracts for parties, nor rescind bargains intelligently made, where no fiduciary relation exists, except upon clear and convincing proof of fraud.

Appeal from Wayne. (Hosmer, J.) Argued April 13, 1894. Decided June 16, 1894.

Bill to rescind an exchange of real estate on the ground of fraud. Defendants appeal. Decree reversed, and bill dismissed. The facts are stated in the opinion.

*James H. Pound,* for complainant.

*Robert Young,* for defendants.

MONTGOMERY, J. This is a bill filed to rescind a trade. On the 18th of November, 1889, complainant was the owner of 94 feet of land on Ash street, in the city of Detroit, upon which were situated a dwelling-house and a double tenement house, which consisted of a cooper shop reconstructed. This property was incumbered to the amount of $4,700, or thereabouts, by a mortgage which had been foreclosed, and the redemption on which would have expired in March, 1890. Complainant was also engaged in a small way in the grocery business, and had property which she used in connection with this business, consisting of store furniture and fixtures, amounting to about $300. Defendant Ella F. Linn was the owner of an hotel property known as the "Central Hotel," at Tecumseh, Mich., incumbered to the amount of $1,800.

She was also the owner of the furniture in the hotel, which complainant in her bill alleges to have been worth about $400. On the day in question, by a memorandum agreement, complainant agreed to exchange the Ash-street property, subject to the incumbrance, and $300 of store fixtures, for the hotel and furniture, which were to be taken subject to the incumbrances. On the 21st of November the exchange was effected, and the deeds passed between the parties. The hotel was at the time in the possession of a tenant, who remained until some time in January following, when complainant went to Tecumseh, and took possession. Defendant took possession of the Ash-street property, and built another house upon it, costing upwards of $2,300. On the 2d day of February, 1891, this bill was filed. The bill charges that the defendant W. F. Linn was the agent of the defendant Ella F. Linn, in whose name the title to the hotel property stood, and that, in effecting the exchange, he was guilty of fraudulent representations, which induced the complainant to part with the title to her property. The fraudulent statements and acts relied upon are as follows: That complainant contemplated a sale of the Detroit property, and that defendant W. F. Linn assured her that he would give her $500 more in trade; that he represented the hotel property to be worth $6,000; that it was situated in a flourishing village; that it was rented to a good tenant at $40 per month; that from 16 to 20 boarders were constantly at the hotel, paying for their board; and that complainant, her husband, and her daughters could make $600 to $800 net per year from running the hotel. The bill also avers that the hotel register was stuffed with fictitious names, to make it appear that there were in fact the number of boarders reported. It also avers that defendant stated that the incumbrances were held by men who were willing to

101 MICH.—5.

extend the time. The answer denies all fraudulent representations. The circuit judge granted the relief prayed in the bill, and defendants appeal.

The record is voluminous, and the testimony is in some points conflicting. We have examined the case with care, and feel constrained to say that the testimony has not left upon us the same impression which it evidently did upon the circuit judge, and that our conclusions are based very largely upon the undisputed testimony and upon that of complainant herself. Complainant testified that the defendant W. F. Linn represented that the hotel property was worth $6,000. Her husband was called by her as a witness, and in answer to the question "How much did he say the property was worth there?" said "About $5,000, without the furniture." This, in connection with the fact that the consideration stated in the deed was $5,000, is convincing evidence that the complainant's recollection is at fault on this point at least. Complainant testified as to the furniture that Mr. Linn at first claimed that it was worth $1,500, but that, after she saw it, she said that she would not give $500, and that it was put in at $400. The bill also avers the value of the furniture to have been $400. Pending the negotiations for the trade, the complainant, accompanied by Mr. Monaghan, an agent of the defendants, visited Tecumseh, and made some examination of the hotel. It is true she now testifies she had little opportunity to examine the hotel, but she also testifies that, after her return from Tecumseh, she told Mr. Linn she would not give $500 for the furniture, and that "Mr. Monaghan went on to tell him, in my presence, that there was this broken, and that, and that it was in a dilapidated condition, and so on; and finally Linn agreed to take $500, and, when we made the trade, I think we considered it at four." This testimony is significant to show the extent of the investigation which complainant

evidently made of the furniture; and if it is true, as stated, that Mr. Linn at first asked $1,500 for the furniture, and afterwards, upon her investigation, was willing to accept $500, it is next to absurd to say that she would after this rely upon his estimate of the value of the other property included in the trade.

The testimony as to the actual value of the property is conflicting. Complainant called numerous witnesses, who fixed the cash value of the hotel property without the furniture at $2,500, but they state that it was worth more by way of trade. Among the witnesses called by complainant is one who has been assessor of the village for eight or nine years, and has assessed the property at $2,800 to $3,200. In the year 1889 it was assessed at $3,200. This act of the witness is wholly inconsistent with his present testimony, and well illustrates the danger of resting an inference of fraud upon the mere statement of value. It is well known that real estate is not often assessed at *more* than its cash value. It often occurs that it is assessed much below. For instance, complainant's property, which she claims was worth $8,000, was assessed at $3,200, and it is not without its significance that the assessed value of both properties at the time of the trade was the same. The defendants called numerous witnesses, who testified that the hotel property, exclusive of the furniture, was worth $4,500. There is the same discrepancy in the proof as to the value of complainant's property. We think $7,000 is a fair valuation of the property. It was incumbered by mortgage already foreclosed, amounting to $4,700, leaving an equity of $2,300. If we add the value of the personal property,—$300,—complainant put into the trade $2,600. If the defendant be credited with $400 for the furniture, this leaves $2,200 which complainant paid for defendant's equity in the hotel property, making the price of the hotel property $4,000. We are

convinced that the testimony fairly shows the property to have been worth at the time of the exchange this sum.

As to the representation that Tecumseh was a flourishing village, the defendant Linn testifies that he read to the complainant a statement from the Michigan State Gazetteer. The complainant, as before stated, visited the village. Mr. Monaghan took a horse and buggy, and drove her about the village; and the testimony of her own witnesses shows that the village is not a dead town, as averred in her bill.

The complainant claims that the defendant misrepresented in stating that Mr. Hunt, the tenant, was willing to retain the house. But it appears—First, by the testimony of her husband, that Mr. Linn had seen fit to secure the payment of the rent by the tenant by a mortgage upon property owned by him; and, second, it appears by the complainant's own statements that the defendant represented to her that she would be able to do well by keeping the hotel herself, with her husband and daughters. More than this, it appears by her own testimony that on the occasion when she and Mr. Monaghan went to Tecumseh, before the trade was completed, Mr. Monaghan stated that the Hunts were allowing the business to run down.

As to the allegation that the hotel register was stuffed for the purpose of deceiving the complainant, the complainant seeks to prove this by the testimony of the witness Hunt. We are not satisfied that this witness' testimony is reliable. But certainly, if any effort was made in this direction, it failed to have any influence upon the complainant in this case; for not only does it appear by her own testimony that complainant never saw the register prior to the exchange, but an equally conclusive answer to this claim is that she testified that Mr. Monaghan registered her name and his in the hotel register, on the day when she visited Tecumseh, after dinner. She also testified that they reached there after the regular dinner

hour, so that dinner had to be prepared for them; and an examination of the register for that day discloses the fact that the names claimed to have been added for the purpose of giving a false appearance appeared on the register after the names of complainant and Monaghan.

The bill avers that the defendant represented that there were 16 to 20 regular boarders. Complainant's husband testifies that the defendant represented that there were 18 to 20. Complainant, in her testimony, says that the representation was that there were 16 to 18, and she also testifies that defendant's agent, Monaghan, told her that the tenant was running the trade down somewhat. We do not think that, upon such testimony as this, it could be said that complainant was deceived as alleged in her bill.

As bearing upon the question of the extent of the business which the hotel was doing, the complainant avers in her sworn bill that, on the day when she was in Tecumseh with Mr. Monaghan, she had dinner in the hotel with seven others, and there was another table, upon which the debris of as many more meals appeared. In her testimony given at the trial she swears:

" Q. About how many dishes were there that had been set there, and apparently dirty, as though to show the number of people that had been eating there at that time, as near as you can tell?

" A. I think there was all the way from 18 to 24. There was four tables that had dishes on.

" Q. Four tables that had had dishes that had been used, in the dining room?

" A. Yes, sir; and a couple of the transient tables that was not used. All the way from 18 to 24. I won't say positively. There was two men eating in the room, too, when we went in. I had forgotten that."

This testimony is too unsatisfactory to justify a decree in favor of the complainant, if it stood uncontradicted.

Her memory was at fault either when she swore to her bill, or when she gave her testimony on the trial.

It is undoubtedly true that the defendant sought to impress upon the complainant the belief that the exchange would be to her advantage. There was nothing fraudulent in this, nor is there anything to indicate that defendant did not in good faith believe that such exchange would be to her advantage. She herself testifies that the property which she held was almost lost to her. She had not been able to make the payments. And, while it has turned out that she did not make a success in keeping hotel, it may be for the reason stated in one of her letters, in which she says: "I am very sorry I ever saw the place. We are not adapted to keeping hotel." The trade has proven unfortunate for complainant. She has sought to establish the right to rescind by charging against the defendant various fraudulent acts and statements, some of which are material and some not; but her own testimony fails to establish these charges. Courts cannot make contracts for parties, nor rescind bargains intelligently made, where no fiduciary relation exists, except upon clear and convincing proof of fraud. We are convinced that the testimony in this case was not such as to justify a decree rescinding the sale.

The decree will be reversed, and the bill dismissed, with costs of both courts to defendants.

The other Justices concurred.